**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ  07079
Telephone: (973)  313-1887
Facsimile: (973) 833-0399
lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MIKE HOFER, INDIVIDUALLY, AND  DERIVATIVELY ON BEHALF OF STRAIGH PATH COMMUNICATIONS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. |
| HOWARD JONAS, DAVIDI JONAS, JONATHAN RAND, WILLIAM F. WELD, K. CHRIS TODD, and FRED S. ZEIDMAN, | ) ) ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** **(1) BREACH OF FIDUCIARY DUTY;** |
| Defendants, | ) ) | **(2) ABUSE OF CONTROL;** **(3) GROSS MISMANAGEMENT;** |
| And | ) ) | **AND** **(4) UNJUST ENRICHMENT** |
| STRAIGHT PATH COMMUNICATIONS, INC., | ) ) ) | JURY TRIAL DEMANDED |
| Nominal Defendant. | ) ) ) ) ) | |

Plaintiff Mike Hofer ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Straight Path Communications, Inc. ("Straight Path" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Howard Jonas, Davidi Jonas, Jonathan Rand, William F. Weld, K. Chris Todd, and Fred S. Zeidman, (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors, officers and/or controlling shareholders of Straight Path, and unjust enrichment for his complaint against Individual Defendants, and alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Straight Path, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Straight Path's directors, officers and/or controlling shareholders who, from October 29, 2013 through November 5, 2015 (the "Relevant Period"), breached their fiduciary duties to Straight Path, by making false and misleading statements and by failing to disclose to the investing public that: (1) the value of Straight Path's key spectrum assets is overstated, and in fact, they may not be commercially viable; (2) Straight Path's spectrum licenses may have been fraudulently obtained by its predecessor company and may not be valid; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

2. Straight Path is a self-described communications asset company. The Company owns, via intermediate wholly-owned subsidiaries: (1) 100% of Straight Path Spectrum, Inc. ("Straight Path Spectrum"), which holds, leases, and markets fixed wireless spectrums through its wholly owned subsidiary Straight Path Spectrum, LLC; and (2) 84% of Straight Path IP Group, Inc. ("Straight Path IP"), which holds intellectual property primarily related to communications over

computer networks, and the licensing and other businesses related to this intellectual property.

3.      Straight Path was formerly a subsidiary of IDT Corporation ("IDT Corp."), until it was spun-off to its stockholders on July 31, 2013.   IDT is a telecommunications company founded by Defendant Howard Jonas, father of Straight Path's Chief Executive Officer, Defendant Davidi Jonas.

4.      Upon the spin-off, Defendant Howard Jonas transferred his shares of Straight Path common stock to The Patrick Henry Trust DTD July 31, 2013 (the "Trust").  The Trust is the controlling shareholder of Straight Path, owning 72% of the aggregate voting power as of November 18, 2015.  Defendant Howard Jonas is the beneficiary of the economic interest of the shares held by the Trust, but does not have voting power or control of such shares, except that Defendant Howard Jonas' consent is needed with respect to certain significant corporate matters requiring stockholder approval, including the approval of any merger, consolidation, or sale of all or substantially all of the Company's assets.

5.      Although Defendant Howard Jonas appears to have abdicated control of his shares, and thus the company, in fact he has significant control of Straight Path.  First, his son, Defendant Davidi Jonas, is the Chief Executive Officer and Chairman of the Company's Board.  Prior to joining his father in business,

Defendant Davidi Jonas was a rabbi at a synagogue in New York. His lack of experience in the field has often been noted by analysts and critics of the Company. Second, there is a Transition Services Agreement between Straight Path Communications Inc. and IDT Corporation, dated July 31, 2013 (the "TSA"), pursuant to which IDT, which is controlled by Defendant Howard Jonas, provides certain services to the Company including, but not limited to, services relating to human resources, finance, accounting, tax, connectivity, and legal. During fiscal year 2015, the Company paid IDT $211,559 in connection with services provided under the TSA. Thus, Defendant Howard Jonas is very much a part of the Company's management. Third, Howard Jonas' consent is needed with respect to certain significant corporate matters requiring stockholder approval, including the approval of any merger, consolidation, or sale of all or substantially all of the Company's assets

*Spectrum Licenses*

6.      A spectrum is an invisible infrastructure over which wireless data travels. The Federal Communications Commission ("FCC") regulates spectrum licenses. The FCC also requires renewal of spectrum licenses and those who hold licenses must meet service requirements under the 27 CFR 101.17.

7.     In December 2001, IDT, through its subsidiary, Winstar Holdings, LLC, acquired FCC spectrum licenses and other assets from the bankruptcy estate of Winstar Communications, Inc.   Certain of those spectrum licenses were transferred to Straight Path Spectrum (then known as IDT Spectrum, Inc.).  Certain licenses were allowed to lapse upon expiration, and others were extended, resulting in the holdings described below.

8.     Straight Path claims to hold 828 spectrum licenses of 39 gigahertz ("GHz") band and 133 spectrum licenses in the multipoint distribution service band.  Straight Path plans for its 39 GHz holdings to be the premier frequency for future millimeter wave 5G mobile communication.

9.     At the moment, the most advanced cell phone technology is 4G LTE. 5G is considered to be the next generation of cellular technology after 4G LTE; unfortunately, it is years away from standardization and commercial release.

10.    The Company's value hinges largely upon the commercial viability of Straight Path's 39 GHz spectrum licenses for future use in wave 5G mobile communication.  In fact, the Company has repeatedly stated in press releases and public filings that it is the largest holder of 39 GHz licenses with a portfolio uniquely suited to enable comprehensive national wireless backhaul solution for multiple uses, including a nationwide 5G network.

11.    In October 2015, Kerrisdale Capital published a report that questioned the commercial viability of Straight Path's spectrum licenses, discrediting their inferred monopoly of the 5G spectrum.  Not long thereafter, on November 5, 2015, Sinclair Upton Research published a report concluding that the Company's licenses for the 39 GHz wireless sites were obtained under fraudulent misrepresentation, and were likely not valid.

12.    As a result of the Individual Defendants' false and misleading statements concerning the value and viability of their Spectrum licenses, the price of Straight Path stock plummeted from $47.58 per share at close on October 28, 2015, to $12.81 per share at close on November 5, 2015.

13.    The Individual Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer and Chairman and the Company's Chief Financial Officer to a federal securities fraud class action pending in this Court, to the need to undertake internal investigations, to losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Individual Defendants' scheme of intentional and/or reckless misconduct and through payments to related parties, and will cost the Company going forward many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are the Company's current Directors, Officers, and/or controlling shareholders, of the substantial likelihood of their liability in this derivative action and in the federal securities law class action, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

16.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New Jersey or who has minimum contacts with this District to justify the exercise of jurisdiction over them

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of shares of Straight Path.  Plaintiff has continuously held Straight Path common stock at all relevant times.  Plaintiff is a resident of California.

### Nominal Defendant Straight Path

20.    Nominal Defendant Straight Path is a Delaware Corporation with headquarters located at 5300 Hickory Park Drive, Glen Allen, Virginia 23059. Straight Path is an intangible asset monetization company that specializes in maximizing the value of assets such as microwave bandwidth licenses (Spectrum) and Intellectual Property (IP). Straight Path holds, leases and markets fixed wireless spectrum licenses in the U.S., including 828 licenses of 39 GHz band and 133 licenses in the local multipoint distribution service band.  Straight Path's stock

trades on the New York Stock Exchange ("NYSE") under the ticker symbol "STRP."

**Defendant H. Jonas**

21.     Defendant Howard Jonas ("H. Jonas") is the Founder and Chairman of the Board of IDT Corporation, and served as its CEO through December 2013. Defendant H. Jonas is the Trustee of the Trust; the Trust is the beneficial owner of 72% of the Company's issued and outstanding Class B common stock.  As a holder of 100 shares of Straight Path IP common stock, Defendant H. Jonas recently received a distribution of $564,734.00, representing his pro rata share of a Board-approved dividend to minority holders of Straight Path IP stock.

22.     Upon information and belief, Defendant H. Jonas is a citizen and resident of New York.

**Defendant D. Jonas**

23.     Defendant Davidi Jonas ("D. Jonas") has served as Chief Executive Officer of Straight Path since its inception in April 2013. Defendant D. Jonas has also been a member of the Board of Directors throughout the Relevant Period, has been the Chairman of the Board since August 1, 2013.  Defendant D. Jonas is also the Chairman of the Nominating Committee.

24.    According to the Company's Proxy Statement filed with the SEC on November 24, 2015 ("2015 Proxy Statement"), during the 2015 fiscal year, Defendant D. Jonas received as compensation from the Company: salary in the amount of $325,000, bonus of $90,000, and stock awards of $1,494,900, totaling $1,909,900 in compensation for his services as Chairman of the Board and Chief Executive Officer.  During the 2014 fiscal year, Defendant D. Jonas received as compensation from the Company: salary in the amount of $197,231, bonus of $60,000, and stock awards of $2,002,647, *inter alia*, totaling $2,261,878 in compensation for his services as Chairman of the Board and Chief Executive Officer.  As part of the executive compensation structure, whose stated purpose is to align and executive's interest with the goals of the Company, Defendant D. Jonas is entitled to a cash bonus equal to 2.5% of the Company's net income.

25.    According to the Company's 2015 Proxy Statement, as of November 18, 2015, Defendant D. Jonas beneficially owned 308,255 shares of the Company's issued and outstanding Class B common stock.  Given that, as of the close of business on January 19, 2016 one share of common stock traded for $14.21, that much stock is worth at least $4,380,303.

26.    The Company's 2015 Proxy Statement stated the following about Defendant D. Jonas:

Davidi Jonas has served as Chief Executive Officer, President and Director of SPCI since April 2013, and has served as Chairman of the Board of SPCI since August 1, 2013. He previously served as Vice President, Business Development of IDT Corporation. He has served as manager of Straight Path Spectrum since August 2012 and served as Executive Vice President and director of Straight Path IP Group from November 2012.  Mr. Jonas has also served as the Rabbi of Kingsbridge Center of Israel in the Bronx, New York from 2010-2015.  Mr. Jonas taught Judaic Studies in SAR High School in Riverdale, New York from 2010 to 2012. Mr. Jonas received rabbinic ordination from Yeshivat Chovevei Torah Rabbinical School.

*Key Attributes, Experience and Skills:*

Mr. Jonas is very familiar with the operations included within SPCI and its subsidiaries, as well as IDT's previous efforts to generate value from the related assets.  He has exceptional inter-personal and leadership skills, and is creative in developing new applications for assets and in crafting solutions to challenges.

27.     During the Relevant Period, Defendant D. Jonas made the following sales of Company stock. On September 10, 2015, Defendant D. Jonas sold 9,000 shares of stock for an average of $33.33 per share, for which he received $299,970. On September 24, 2015, Defendant D. Jonas sold 6,000 shares of stock for an average of $40.00 per share, for which he received $240,000.  Thus, in total, before the fraud was exposed, he sold 15,000 Company shares on inside information, for which he received $539,970.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

28.     Upon information and belief, Defendant Jonas is a citizen and resident of New York.

**Defendant Rand**

29.     Defendant Jonathan Rand ("Rand") has served as Chief Financial Officer of Straight Path since June 2013.  According to the 2015 Proxy Statement, during the 2015 fiscal year, Defendant Rand received as compensation from the Company: salary in the amount of $250,000 and a bonus of $50,000, for his services as Chief Financial Officer. During the 2014 fiscal year, Defendant Rand received as compensation from the Company: salary in the amount of $175,000 bonus of $45,000, and stock awards worth $730,330, totaling $950,220 in compensation for his services as Chief Financial Officer.  Defendant Rand is eligible to receive a cash bonus of up to 100% of this base salary (or up to 120% or higher upon extraordinary performance," to be determined by the Compensation Committee, with input from Defendant D. Jonas.

30.     According to the Company's 2015 Proxy Statement, as of November 18, 2015, Defendant Rand beneficially owned 82,898 shares of the Company's issued and outstanding Class B common stock.  Given that, as of the close of business on January 19, 2016, one share of common stock traded for $14.21 that much stock is worth at least $ 1,177,980.

31.    The Company's 2015 Proxy Statement stated the following about Defendant Rand:

> Jonathan Rand has served as Chief Financial Officer of SPCI since June 2013, and has served as Chief Operating Officer of SPCI's subsidiary Straight Path Spectrum, Inc. since January 2014. Mr. Rand served as President and Chief Operating Officer of Organic Motion, an innovative computer vision company, from 2006 to 2012. Mr. Rand co-founded and served as President of Indigo Capital Advisers, providing consulting services to early stage technology companies since 2002.  Mr. Rand served as Executive Vice President of Sales, Treasurer and Chief Executive Officer of the Y@P Division of Net2Phone, Inc. from 1998 to 2001 and Executive Vice President of Sales & Finance and Treasurer of IDT Corporation from 1992 to 1998. Prior to joining IDT, Mr. Rand founded and subsequently sold a national magazine, Campus Connection. Mr. Rand worked in Procter & Gamble's brand management program, after receiving a Bachelor of Science in Economics from the Wharton School, University of Pennsylvania in 1984.

32.    During the Relevant Period, Defendant Rand made the following sales of Company stock. On October 21, 2014, Defendant Rand sold 3,000 shares of stock for an average of $20.29 per share, for which he received $60,861.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

33.    Upon information and belief, Defendant Rand is a citizen and resident of New York.

**Defendant Weld**

34.     Defendant William Weld ("Weld") has served as a member of the Board of Directors since July 2013 and is Chairman of the Corporate Governance Committee and a member of the Audit Committee and the Compensation Committee.  According to the Company's 2015 Proxy Statement, during the 2015 fiscal year, Defendant Weld received as compensation from the Company: $35,000 in cash and $145,840 in stock awards for his service as a non-employee Director.

35.     The Company's 2015 Proxy Statement stated the following about Defendant Weld:

> William F. Weld has served as Director of SPCI since July 2013.  Mr. Weld has been a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and a principal of ML Strategies, LLC, a consulting affiliate of Mintz Levin, since 2012.  Mr. Weld has served as a director of Just Energy (TSX and NYSE: JE) since 2012. Mr. Weld was a partner at McDermott Will & Emery LLP from 2006 to 2012.  In addition, Mr. Weld served two terms as Governor of Massachusetts, being elected in 1990 and re-elected in 1994 and had previously served as Assistant US Attorney General in charge of the Criminal Division of the Justice Department in Washington D.C. Mr. Weld received a Bachelor of Arts from Harvard College and a JD from Harvard Law School.

> *Key Attributes, Experience and Skills:*

> Mr. Weld's extensive legal and other professional experience will serve as valuable asset to the Company.  He has extensive contacts in commercial, legal and governmental arenas, and his managerial experience in public service and the private sector brings important skills to the functioning of the Board of Directors.

36.     Additionally, the Company admitted the following about Weld's entangling relationship with both the Company and his law firm, which serves as the Company's counsel:

> The Corporate Governance Committee considered the following relationship between the Company and William F. Weld in determining Mr. Weld's independence:   Mr. Weld is a contract partner at the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin").   Mintz Levin represents the Company as litigation counsel in legal proceedings related to the Company's enforcement of its intellectual property rights.   As a contract partner, Mr. Weld does not receive any direct or indirect interest in the fees paid by the Company to Mintz Levin nor does he have any involvement in Mintz Levin's representation of the Company.   The Corporate Governance Committee determined, after considering Mr. Weld's position at Mintz Levin, that the foregoing relationship would not impact Mr. Weld's independence. The Corporate Governance Committee (with Mr. Weld abstaining), therefore, recommended that the Board of Directors determine that Mr. Weld be deemed independent in accordance with the Corporate Governance Guidelines. The Board of Directors (with Mr. Weld abstaining) accepted the Corporate Governance Committee's recommendation.

37.     During the Relevant Period, Defendant Weld made the following sales of Company stock. On June 26, 2014, Defendant Weld sold 9250 shares of stock for an average of $9.79 per share, for which he received $90,539.  On March 16, 2015, Defendant Weld sold 3800 shares of stock for an average of $20.26 per share, for which he received $76,984.  On March 17, 2015, Defendant Weld sold 4200 shares of stock for an average of $20.06 per share, for which he received $84,231.  Thus, in total, before the fraud was exposed, he sold 17,250 Company

shares on inside information, for which he received $251,754.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

38.     Upon information and belief, Defendant Weld is a citizen and resident of Massachusetts.

**Defendant Todd**

39.     Defendant K. Chris Todd ("Todd") has served as a member of the Board of Directors since July and currently serves as Chairperson of the Compensation Committee and member of the Audit Committee.  According to the Company's 2015 Proxy Statement, during the 2015 fiscal year, Defendant Todd received as compensation from the Company: $35,000 in cash and $145,840 in stock awards for his service as a non-employee Director.

40.     According to the Company's 2015 Proxy Statement, as of November 18, 2015, Defendant Todd beneficially owned 17,250 shares of the Company's issued and outstanding Class B common stock.  Given that, as of the close of business on January 19, 2016, one share of common stock traded for $14.21 that much stock is worth at least $245,122.

41.     The Company's 2015 Proxy Statement stated the following about

Defendant Todd:

> K. Chris Todd has served as Director of SPCI since July 2013.  Mr. Todd
> has been a partner at the law firm of Kellog, Huber, Hansen, Todd, Evans &
> Figel, P.L.L.C. since 1994.   Prior to that, Mr. Todd was head of the
> Litigation Group at Johnson & Gibbs.   Mr. Todd's extensive career in
> government service includes service as a Law Clerk to a federal judge, as
> Associate Counsel in the Office of Independent Counsel under Lawrence
> Walsh during the Iran/Contra Matter, and as Assistant U.S. Attorney for the
> Criminal Division in the United States Attorney's Office, Southern District
> of New York where Mr. Todd conducted the prosecution of numerous
> violations of federal law, including multi-defendant business fraud and tax
> evasion cases.   Prior to serving in the Southern District, Mr. Todd also
> served as a Trial Attorney for the Department of Justice's Tax Division,
> Criminal Section, where Mr. Todd conducted numerous jury trials and grand
> jury investigations involving tax evasion. He has a Bachelor of Arts from
> Texas Tech University and a J.D. from the University of Texas School of
> Law and completed graduate studies in law at Cambridge University in
> England in 1974.
>
> *Key Attributes, Experience and Skills:*
>
> Mr. Todd's private law practice focused on trial work, including patent
> infringement cases, provides invaluable expertise to the Board with respect
> to our Straight Path IP Group business.

42.     Upon information and belief, Defendant Todd is a citizen and resident

of Washington, D.C.

**Defendant Zeidman**

43.     Defendant Fred S. Zeidman has been a member of the Company's

Board of Directors since July 2013.   He serves as Chairman of the Audit

Committee and qualifies as an "audit committee financial expert."   He is also a member of the Compensation Committee, Corporate Governance Committee and Nominating Committee.   According to the Company's 2015 Proxy Statement, during the 2015 fiscal year, Defendant Zeidman received as compensation from the Company: $35,000 in cash and $145,840 in stock awards for his service as a non-employee Director.

44.   According to the Company's 2015 Proxy Statement, as of November 18, 2015, Defendant Zeidman beneficially owned 17,250 shares of the Company's issued and outstanding Class B common stock.   Given that, as of the close of business on January 19, 2016, one share of common stock traded for $14.21 that much stock is worth at least $245,122.

45.   The Company's 2015 Proxy Statement stated the following about Defendant Zeidman:

> Fred S. Zeidman has served as Director of SPCI since July 2013.   Mr. Zeidman has served as Chairman of the Board of Petroflow Energy Corporation since September 2011 and as Chairman of the Board of Petro River Oil Corporation since 2011. Mr. Zeidman has also served as a director of Hyperdynamics Corporation since 2009 and as a director of Prosperity Bancshares, Inc. since 1986. He formerly served as trustee for the AmeriSoft Liquidating Trust.   Mr. Zeidman has served as CEO, Interim CEO and Chairman of the Board of a variety of companies, including several in the oil and gas sector.   Mr. Zeidman is the Chairman Emeritus of the United States Holocaust Memorial Council. He was appointed to that position by President George W. Bush in March 2002 and served from 2002-2010. He is also Chairman Emeritus of the University of Texas Health Science System

Houston and is on the Board of Trustees of the Texas Heart Institute (where he currently serves as Interim Chief Financial Officer). He formerly served on the Board of Directors and Executive Committee of the University of Saint Thomas and chaired its Development Committee. Mr. Zeidman received his Bachelor of Science and Bachelor of Arts from Washington University and a Masters of Business Administration from New York University.

*Key Attributes, Experience and Skills:*

Mr. Zeidman has served in board and other leadership positions in many entities of varying size and in different industries. His experience and familiarity with the role of a director will round out the Board of Directors and provide a source of input for management to draw on.

46.    Upon information and belief, Defendant Zeidman is a citizen and resident of Texas.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.    By reason of their positions as officers, directors, fiduciaries and/or controlling shareholders of Straight Path and because of their ability to control the business and corporate affairs of Straight Path, the Individual Defendants owed Straight Path and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Straight Path in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Straight Path and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Straight Path and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors, officers and/or controlling shareholders of Straight Path, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers, directors and/or controlling shareholders of Straight Path were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations to Straight Path, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers, directors and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised Straight Path's Board at all relevant times.

52.    As senior executive officers, directors and/or controlling shareholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to prevent the Company from making false and misleading statements by failing to disclose to the investing public: (1) that the value of Straight Path's key spectrum assets is overstated, and in fact, they may not be commercially viable; and (2) that Straight Path's spectrum licenses may have been fraudulently obtained by its predecessor company and may not be valid.

53.    To discharge their duties, the officers, directors and/or controlling shareholders of Straight Path were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the

Company.   By virtue of such duties, the officers, directors and/or controlling shareholders of Straight Path were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the Straight Path's own Code of Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Straight Path conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Straight Path and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

- 23 -

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Straight Path's operations would comply with all laws and Straight Path's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

54.    Each of the Individual Defendants further owed to Straight Path and the shareholders the duty of loyalty requiring that each favor Straight Path's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Straight Path and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, and directorial positions with Straight Path, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Straight Path.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of

their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.   The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects and value; and (iii) to artificially inflate the Company's stock price.

60.   The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently conceal material facts, misrepresent its commercial viability and value, fail to correct such misrepresentations, and violate applicable laws.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

61.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each

of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Straight Path, and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

63.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

64.     The Code of Ethics provides, as to "Conflicts of Interest," that:

Conflicts of interest are prohibited as a matter of Company policy. A "conflict of interest" exists when someone's personal interest interferes in any way with the interests of the Company. Conflict situations may arise when an employee, officer or director takes action or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest may also arise when a director, officer or employee, or a member of his or her family, receives improper personal benefits, including loans, as a result of his or her position in the Company.

It is almost always a conflict of interest for a Company employee to work simultaneously for a competitor, customer or supplier. Company employees are not allowed to work for a competitor as a consultant or board member. The best policy is to avoid any direct or indirect business connection with our customers, suppliers or competitors, except on behalf of the Company.

Conflicts of interest may not always be clear-cut. If you have a question, you should consult with higher levels of management or the Chief Financial Officer. Any director, officer or employee who becomes aware of a conflict or potential conflict should bring it to the attention of a supervisor, manager or other appropriate personnel or should consult the procedures described in Section XIV below.

65.    The Code of Ethics provides, as to "Competition and Fair Dealing,"

that:

We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices. Stealing proprietary information, possessing trade secret information obtained without the owner's consent or inducing the disclosures of proprietary information or trade secrets by past or present employees of other companies is prohibited. Each employee should endeavor to respect the rights of and deal fairly with the customers, suppliers, competitors and employees of the Company. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other intentional practice that may constitute unfair dealing. To maintain the valuable reputation of the Company, compliance with our quality processes and safety requirements is essential. In the context of ethics, quality requires that our products and services be designed and manufactured to meet our obligations to customers. The purpose of business entertainment and gifts in a commercial setting is to create goodwill and sound working relationships, not to gain unfair advantage with customers. No gift or entertainment should ever be offered, given, provided or accepted by any director, officer or employee of the Company, or by any family member of a director, officer, employee or agent, unless it (1) is not a cash gift, (2) is consistent with customary business practices, (3) is not excessive in value, (4) cannot be construed as a bribe or payoff and (5) does not violate any laws or regulations. Please discuss with your supervisor or manager any gifts or proposed gifts if you are uncertain whether they are appropriate.

66.    The Code of Ethics provides, as to "Insider Trading," that:

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the business of the Company. All nonpublic information about the Company should be considered confidential. To use nonpublic information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. The Company has adopted an Insider Trading Policy, and you should have received a copy of this policy. If you have any questions, please consult the Chief Financial Officer.

67.    In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid insider trading, and make accurate and truthful filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Materially False And Misleading Statements Issued During the Relevant Period

68.    The Relevant Period starts on October 29, 2013, when the Company filed with the SEC its annual report on Form 10-K for the fiscal year ending July 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants D. Jonas, Rand, Todd, Weld, and Zeidman. The 2013 10-K states:

> ***We hold a significant number of licenses for commercial fixed wireless spectrum in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and LMDS band.*** We have at least 100MHz of

- 29 -

bandwidth in every location in the United States, and in higher population areas, our licenses (including those we manage, but are still owned by IDT Spectrum) cover 600 MHz or more of bandwidth.

***The Federal Communications Commission grants spectrum licenses of various types according to geographic areas. Our auctioned 39 GHz band spectrum is primarily licensed in Economic Areas, or EAs***. EAs are delineated by the Regional Analysis Division, Bureau of Economic Analysis, U.S. Department of Commerce and are based on metropolitan or micropolitan statistical areas that serve as regional centers of economic activity, plus the surrounding counties that are economically related to these areas.

Prior to adopting service rules for the 39 GHz spectrum distributed by auction, the FCC permitted licensees to define their own service areas. Applicants for licenses provided the latitude and longitude points for the boundaries of their desired service area, thereby creating service areas generally rectangular in shape – rectangular service areas, or RSAs.

Currently, the United States is divided into 176 EAs for the auctioned 39 GHz spectrum. ***Our licenses cover most EAs, and, based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, cover most of the U.S. population. We hold multiple licenses in all U.S. markets including 814 39 GHz EA licenses, and 133 licenses in the LMDS band. Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of total bandwidth in every U.S. market, with up to 1,000 MHz in certain markets. We hold an average of 820 MHz of spectrum in the top 25 EAs. As a result, we believe that we are well positioned to provide a single source of fixed wireless spectrum solutions across a variety of geographic areas and bandwidth requirements.***

- 30 -

IDT Spectrum held licenses covering all of the United States with multiple licenses covering many areas and all major metropolitan areas.   In connection with the application for immediate FCC approval under the Immediate Approval Procedures (IAP) of the change of control of the licenses in connection with the Spin-Off, certain licenses, consisting of 79 RSA licenses and 14 EA licenses - representing all of IDT Spectrum's licenses covering the Washington, D.C. EA have not yet been transferred to us, although we do manage those licenses and can offer access to them to customers.   We and IDT are continuing to pursue the transfer of such licenses and they will be transferred upon receipt of FCC approval.  We cannot predict whether the current lack of licenses with significant bandwidth that we own covering the Washington, D.C. area will impact our sales.

*     *     *

***As of October 24, 2013, Straight Path Spectrum has 814 39 GHz EA licenses with an expiration date of October 18, 2020***. Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC. In a recent transaction, Straight Path Spectrum assigned spectrum that was partitioned and/or disaggregated from eight of its LMDS and 39 GHz EA licenses. ***Straight Path Spectrum also has 34 active 39 GHz RSA common carrier licenses, the vast majority of which expire in early to mid-2017. Straight Path Spectrum has filed substantial service showings for all of these active 39 GHz RSA licenses and these showings have been accepted by the FCC.   In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016.  Straight Path Spectrum has met its substantial service build-out obligations for its LMDS licenses***.

In connection with the application for immediate FCC approval

under the IAP of the change of control of the licenses in connection with the Spin-Off, certain licenses, consisting of 79 RSA licenses and 14 EA licenses - representing all of IDT Spectrum's licenses covering the Washington, D.C. EA have not yet been transferred to us.   We and IDT are continuing to pursue the transfer of such licenses and they will be transferred upon receipt of FCC approval, and in the interim we manage the leasing or those licenses for IDT Spectrum.

(Emphasis added.)

69.    The 2013 10-K contained signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Jonas and Rand stating that the financial information contained in the 2013 10-K was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

70.    On December 4, 2013, the Company released an investor presentation that stated, in relevant part:

- Straight Path Spectrum is the largest holder of 39 GHz licenses in the US.
  - Mobile data usage is exploding and massive small cell roll outs are needed to meet the increasing bandwith demand;
  - Portfolio includes 39 GHz (814 licenses) and 28 GHz LMDs (133 licenses) covering all markets, with an average of 820 MHz/market in the top 25 markets
  - Nationwide coverage with control of nearly 70% of the active GHz spectrum

71.     On January 9, 2014, the Company held a conference call to introduce Straight Path to the investment community and to provide general business updates.

72.     During the conference call, Defendant D. Jonas stated in relevant part:

*Today, Straight Path Spectrum holds 814 39 GHz licenses, making us the largest holder of these licenses in the United States. We have coverage in all of the top 25 markets and are the only Company to have nationwide coverage in this space that is well suited for backhaul. This is a unique asset in today's market where efficient, high bandwidth coverage is in such high demand. We also hold 133 28 GHz licenses, many of them in the top markets, which supplement our core 39 GHz holdings and increase our coverage and bandwidth.*

\*       \*       \*

To summarize, we believe our two operating units offer significant upside opportunity to investors. *Given the current wireless landscape and shift to 4G as well as future generations of new technology, we believe that increased demand for bandwidth will result in tremendous opportunities to exploit our spectrum holdings.* On the IP side, there continues to be numerous entities – large and small – that are using our IP without permission, and we will continue to explore all reasonable business and legal means to achieve compensation.

73.     On March 18, 2014, the Company held a conference call to discuss the second quarter of 2014 earnings.   On the call, Defendant D. Jonas stated in relevant part:

Now, to focus for a few moments on the long-term potential of our Spectrum assets. *As spectrum goes, the most valuable*

*spectrum is what is called access or mobile spectrum. Those are the frequencies that go directly to mobile devices and there is a gross lack of such spectrum. In order to compensate for the lack of available spectrum that has been used for mobile to-date, there is a growing body of study and testing focused on millimeter wave frequencies, specifically 28 and 39 GHz, as the next generation of mobile spectrum, widely known as 5G.* Initial tests have shown that even in congested urban environments, there is reason to believe that within appropriate distances, millimeter spectrum such as ours can be viable mobile access spectrum. It is a positive sign for the future of our business, when leading companies such as Intel, Samsung, Ericsson, AT&T, Qualcomm, and other industry leaders, are supporting the study of millimeter wave mobile spectrum, and, in some instances, are themselves doing testing and making plans to bring their results to market within the next number of years. ***The implications for Straight Path are huge.***

74.     On May 29, 2014, the Company released an investor presentation that

stated, in relevant part:

- Straight Path holds 70% of active 39 GHz spectrum – more than Sprint & ATT in other bands
- Nationwide coverage in all markets in U.S. and over 800 GHz in top 25 markets – including 39 GHz (814 licenses) and 28 GHz LMDS (133 licenses)
- Data usage is exploding year over year
- Multiple market needs for more Spectrum

*        *        *

- Nationwide Coverage - Straight Path is the largest holder of 39 GHz licenses with a portfolio uniquely suited to enable comprehensive national wireless backhaul solution for multiple uses including back haul, last mile, small cell deployment, and nationwide 5G network

- Concatenation of 50 MHz Channels - Larger serving channels (i.e. supports 150 MHz wide channels) for very hi-throughput and quality
- Point-to-Multi-Point (PMP) Deployment - Allows for sectored or wide band antennas. Wide broadcast area minimizes need for precision antenna and base station placement
- 3½ inch Small Form Antennas - FCC waived rules for Category A antenna deployment to enable use of very small 39 GHz antennas integrated into small cell base stations

75.   On September 3, 2014, the Company issued a press release titled "Straight Path Communications Hires CTO to Lead the Charge to 5G," in which Defendant D. Jonas stated, in relevant part:

> "As we continue to execute on our near, mid, and long term business goals, Jerry will be an invaluable addition to our team, helping to ensure that our thought leadership and market strategy will unlock great value from our nationwide, unparalleled spectrum assets. We plan for our 39 GHz holdings to be the premier frequency for millimeter wave 5G mobile communication, and our new CTO is an excellent choice to help us achieve that goal."

76.   On October 14, 2014, the Company filed a Form 10-K with the SEC for the fiscal year ending July 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants D. Jonas, Rand, Todd, Weld, and Zeidman.   The 10-K stated:

> **We hold a significant number of licenses for fixed wireless spectrum ("Spectrum") in the United States, providing broad**

*geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz (Gigahertz) band and LMDS (or 28 GHz) band. We have 39 GHz Spectrum licenses covering the entire continental United States with an average of 833 MHz (Megahertz) of bandwidth in the top 30 U.S. markets (measured by population according to the 2010 U.S. Census), as well as LMDS licenses in many key markets.*

\*       \*       \*

*We hold a significant number of licenses for fixed wireless spectrum in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and LMDS, or 28 GHz, band. We have at least 100MHz of bandwidth in every Economic Area in the United States in 39 GHz, and in higher population areas, our licenses cover 600 MHz or more of bandwidth in the 39 GHz band; for instance, in the top 30 markets (by population) we have an average of 833 MHz in the 39 GHz band.*

\*       \*       \*

Our auctioned 39 GHz band spectrum is primarily licensed in Economic Areas, or EAs. EAs are delineated by the Regional Analysis Division, Bureau of Economic Analysis, U.S. Department of Commerce and are based on metropolitan or micropolitan statistical areas that serve as regional centers of economic activity, plus the surrounding counties that are economically related to these areas.

Currently, the United States is divided into 176 EAs for the auctioned 39 GHz spectrum. *Our licenses cover 175 EAs, the only EA our Spectrum is not authorized for use is EA 176, the Gulf of Mexico*. Based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, we cover all of the U.S. population. *We hold multiple licenses in all U.S. markets including 828 39 GHz licenses, and 133 licenses in the LMDS band.* Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of

- 36 -

total bandwidth in every U.S. market, with up to 1,100 MHz in several markets. We hold an average of 833 MHz of spectrum in the top 30 EAs in the 39 GHz band. As a result, we believe that we are well positioned to provide a single source of fixed wireless Spectrum solutions across a variety of geographic areas and bandwidth requirements.

*      *      *

***Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC which is effective for the current period of the licenses, through 2020. Therefore, as of October 14, 2014, Straight Path Spectrum had 828 39 GHz EA licenses with an expiration date of October 18, 2020.  In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016.*** Straight Path Spectrum will be required to demonstrate substantial service in order to renew its licenses for another ten year term.

(Emphasis added.)

77.    The 2014 10-K also addresses Straight Path's 5G technology, stating in relevant part:

 Recently the Chairman of the Federal Communications Commission, Tom Wheeler, promised to take initial steps (to consider a Notice of Inquiry) that may lead to adopting rules for mobile service in our frequency band(s). ***Millimeter wave mobility in our frequency band(s) is perhaps the greatest potential opportunity for Straight Path Spectrum—to maximize the usability and value of our spectrum assets. Straight Path Spectrum is actively pursuing this— being the only millimeter spectrum holder to become an Industrial Affiliate in the leading 5G think tank in the United States, NYU WIRELESS, as well as hiring Jerry Pi, a leader in 5G, as our Chief***

- 37 -

*Technology Officer.*

\* \* \*

***Our Spectrum*** is primarily used to provide backhaul services for existing Wireless Internet Service Providers (WISPs), for backhaul for Mobile Network Operators (MNOs), and ***is contemplated for use in next generation mobile solutions such as 5G.***

\* \* \*

***As the demand for significantly greater capacity within wireless networks has grown rapidly, planning and investment for 5G networks has already begun. Our Spectrum holdings— which cover the entire continental US, and have capacity that is substantially greater than currently used access frequencies are well-suited for use in a 5G network.*** The FCC has recognized in the past that the frequencies in which we operate might one day be usable for mobility (i.e. access to mobile devices), but have deferred proposing and adopting rules to govern such usage until technology and market forces would justify such rule making.

(Emphasis added.)

78. The 2014 10-K contained SOX certifications signed by Defendants D. Jonas and Rand stating that the financial information contained in the 2014 10-K was accurate, all fraud was disclosed and any material changes to the Company's internal control over financial reporting were disclosed.

79. On October 14, 2014, the Company held a conference call to discuss the fourth quarter of 2014 earnings. On the conference call, Defendant D. Jonas discussed Straight Path's high frequency portfolio, stating in relevant part:

I would now like to focus on the long term opportunity for our

spectrum: access to mobile devices. It has been a long-held assumption that high frequency cannot be utilized for mobile services. The propagation characteristics are such that interposing objects cause a severe degradation. Thus, higher frequency is often called millimeter wave, having, in most instances, been fixed and required line of sight. However, recent technology developments have demonstrated that higher frequencies, specifically above 24 GHz, can be utilized for mobile applications.

**New antenna and processing capabilities enable high-frequency waves to bypass interposing objects within limited yet substantial distances, having a potential coverage area far greater than wifi**.

**The prospect of our spectrum being utilized for access to mobile devices is both real and a potential value game changer**. According to analysts, much of the spectrum that is used for mobile broadband is valued between $0.50 and $2 per MHz

\* \* \*

While the commercial adoption of such technology is years away, the proverbial handwriting is on the wall. The industry leaders are committed, prototypes have been demonstrated, the process of refining, testing, miniaturizing, implementing, and deploying will take time. **But we believe, and the FCC's actions bolster our belief, that our spectrum will be a critical element of mobile broadband in the foreseeable future**.

80.    On March 12, 2015, the Company filed a Form 10-Q with the SEC for the quarter ending January 31, 2015 (the "2Q 2015 10-Q"). The 2Q 2015 10-Q was signed by Defendants D. Jonas and Rand. The 2Q 2015 10-Q contained SOX certifications signed by Defendants D. Jonas and Rand stating that the financial

information contained in the 2Q 2015 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed. The 2Q 2015 10-Q stated in relevant part:

> Straight Path was incorporated in April 2013. Straight Path's businesses consist of a 100% ownership of Straight Path Spectrum, Inc. ("Straight Path Spectrum"), which holds, leases and markets fixed wireless spectrum licenses, and a 84.5% ownership of Straight Path IP Group, Inc. ("Straight Path IP Group"), which holds intellectual property primarily related to communications over the Internet, and the licensing and other businesses related to this intellectual property. In these financial statements "the Company" refers to Straight Path, Straight Path Spectrum, and Straight Path IP Group on a consolidated basis. All material intercompany balances and transactions have been eliminated in consolidation.
>
> *　　*　　*
>
> ***Our Spectrum holdings are comprised of area wide licenses in the 39 and 28 GHz frequency bands from the Federal Communications Commission ("FCC").***

(Emphasis added.)

81.    In April 2015, the Company released an investor presentation that stated, in relevant part:

- Straight Path Spectrum holds 39GHz spectrum nationwide and 28GHz in key markets
- 39GHz deep coverage over entire US – more than Sprint & ATT in other bands • Includes 828 licenses of 39GHz spectrum and 133 licenses of 28GHz spectrum (16 A Band)
- Data usage is exploding year over year – multiple market

> applications need more spectrum
- FCC considering changing regulations to enable 39GHz spectrum for mobile access use

82.     On June 9, 2015, the Company filed a Form 10-Q for the quarter ending April 30, 2015 (the "3Q 2015 10-Q"). The 3Q 2015 10-Q was signed by Defendants D. Jonas and Rand. The 3Q 2015 10-Q contained SOX certifications signed by Defendants D. Jonas and Rand stating that the financial information contained in the 3Q 2015 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed. The 3Q 2015 10-Q contained the same comments, quoted above, regarding Spectrum Holdings that appeared in the Company's 2Q 2015 10-Q.

83.     On October 14, 2015, the Company filed its Form 10-K with the SEC for the fiscal year ending July 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants D. Jonas, Rand, Todd, Weld and Zeidman.  The 2015 10-K states in relevant part:

> ***We hold a significant number of licenses for fixed wireless spectrum ("Spectrum") in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and Local Multipoint Distribution Service ("LMDS" or "28 GHz") band***. We have 39 GHz Spectrum licenses covering the entire continental United States with an average of 800+ megahertz ("MHz") of bandwidth in the top 30 U.S. markets (measured by population according to the 2010 U.S. Census), as well as LMDS licenses in many key markets.

\*      \*      \*

*We hold a significant number of licenses for fixed wireless spectrum in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and LMDS, or 28 GHz, band. We have at least 100MHz of bandwidth in every Economic Area in the United States in 39 GHz, and in higher population areas, our licenses cover 600 MHz or more of bandwidth in the 39 GHz band; for instance, in the top 30 markets (by population) we have an average of 800+ MHz in the 39 GHz band.*

*Our auctioned 39 GHz band spectrum is primarily licensed in Economic Areas, or EAs.* EAs are delineated by the Regional Analysis Division, Bureau of Economic Analysis, U.S. Department of Commerce and are based on metropolitan or micropolitan statistical areas that serve as regional centers of economic activity, plus the surrounding counties that are economically related to these areas.

Currently, the United States is divided into 175 licensable EAs for the auctioned 39 GHz spectrum. Our *licenses cover all 175 EAs*. Based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, we cover all of the U.S. population. *We hold licenses in all U.S. markets including 828 39 GHz licenses (90+% of active EA licenses), and 133 licenses in the LMDS band. Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of total bandwidth in every U.S. market, with up to 1,100 MHz in several markets. We hold an average of 800+ MHz of Spectrum in the top 30 EAs in the 39 GHz band. As a result, we believe that we are well positioned to provide a single source of fixed and mobile wireless Spectrum solutions across a variety of geographic areas and bandwidth requirements*.

\*      \*      \*

*Our Spectrum licenses in the LMDS and 39 GHz bands are granted for ten-year terms*. The renewal date for our New York

City LMDS license is in February 2016, renewal dates for our 132 other LMDS licenses are in 2018, and the renewal dates for our 39 GHz EA licenses are in 2020. A "substantial service" requirement applies to each of these LMDS and 39 GHz licenses. This requirement is intended to provide licensees with flexibility in constructing their licenses. The FCC has established "safe harbor" guidelines that provide licensees with a degree of certainty as to how to comply with the requirement, but they are not the only way to demonstrate substantial service. Generally, if a licensee can demonstrate that it has made meaningful use of the licensed frequencies, it is able to make the requisite showing, although there is evolving precedent in this area. Furthermore, the FCC has taken a flexible approach to nonbroadcast license renewal, an approach that has evolved over the past several years, including, for example, the potential for substantial service to be demonstrated by niche, specialized or technologically sophisticated services. If the FCC finds that a licensee has failed to meet the substantial service requirement for any license, however, that authorization is subject to termination.

***Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC which is effective for the current period of the licenses, through 2020****. Therefore, as of October 14, 2015, Straight Path Spectrum has 828 39 GHz EA licenses with an expiration date of October 18, 2020. In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016*.** Straight Path Spectrum will be required to demonstrate substantial service in order to renew its licenses for another ten year term.

*     *     *

***Our Spectrum holdings are comprised of area wide licenses in the 39 GHz and 28 GHz frequency bands from the FCC****.*

- 43 -

(Emphasis added.)

84.   The 2015 10-K also discussed Straight Path's 5G technology, stating in relevant part:

> On October 17, 2014, the Federal Communications Commission (the "FCC") released a Notice of Inquiry ("NOI") to examine the potential for the provision of mobile radio services in bands above 24 Gigahertz ("GHz"), and identified 39 GHz and 28 GHz as two potential candidates. ***These bands make up our primary Spectrum holdings, and we believe if the FCC and the wireless industry adopt these bands for mobile use in such applications as 5G networks, such actions may have a significant, ongoing favorable impact on the value of these assets.***
>
> \*     \*     \*
>
> ***Our Spectrum is currently used primarily to provide fixed wireless services for existing Wireless Internet Service Providers ("WISPs") and Mobile Network Operators ("MNOs"). Our Spectrum is also contemplated for use in next generation mobile solutions such as small cells and 5th Generation Mobile Networks ("5G").***
>
> \*     \*     \*
>
> As the demand for significantly greater capacity within wireless networks has grown rapidly, planning and investment for 5G networks has become a major focus of the mobile industry. ***Our Spectrum holdings—which cover the entire continental US and have capacity that is substantially greater than currently used access frequencies—are well-suited for use in a 5G network.***
>
> \*     \*     \*
>
> ***We are also actively pursuing more dynamic opportunities, primarily 5G, to market our Spectrum for applicable additional uses.*** Straight Path is a contributing member of ATIS

3GPP, the leading standard setting body for 5G. We are advocating for bands up to 40 GHz to be included in the initial standards for 5G.

We are opening our Gigabit Mobility Lab in Plano, Texas to be run by our Chief Technology Officer, Zhouyue (Jerry) Pi. We plan to hire additional personnel with technical expertise to achieve our goal: *to develop a next-gen transceiver capable of mobile services at 39 GHz within 18 months. We believe we have the ability to deliver on this goal, and to thereby seek to have a noticeable impact on the wireless industry and to continue to build the inherent value in our Spectrum*.

*        *        *

The exponentially increasing demand for mobile broadband, coupled with the shortage of spectrum (below 3 GHz) traditionally used for mobile communication and mobile data transmission has spurred technological advances that can utilize millimeter wave frequencies— such as ours—to "access" mobile devices.

Until recently millimeter wave frequencies[1]—those bands from 24 GHz and higher, including our 39 GHz and LMDS—have not been considered for access to mobile devices due to their propagation characteristics. As a result millimeter wave frequencies have been limited to fixed, line-of-sight applications. Access spectrum, on the other hand, can penetrate or bypass interposing objects, such as buildings, and reach to the endpoints, i.e. end user devices, such as mobile phones, tablets, and other portable devices without line-of sight (non line-of-sight). Over the past several years—as data consumption has increased exponentially, and concern has risen regarding the adequacy of the current supply of access spectrum (often

---

[1] While millimeter wave traditionally refers to frequencies between 30 and 300 GHz, we use the term to refer to 24 GHz and above, as that is the range that the FCC has indicated an interest in developing to allow mobile usage therein.

Straight Path Spectrum joined NYU WIRELESS as an Industrial Affiliate to support and encourage the advances and commercialization of 5G millimeter wave technology.

- 45 -

referred to as the "spectrum crunch")—technologists have developed innovative base station devices with far greater number of antenna components (i.e. phased array) that can overcome the current propagation limitations for short, yet substantial distances—far **shorter than fixed line-of-sight links, yet far greater distances and capacity than current Wi-Fi implementations.**

**others—are also Industrial Affiliates at NYU WIRELESS. We expect to work collaboratively with these and other technology companies to highlight** our assets for utilization for millimeter wave mobility. Straight Path also hired Zhouyue (Jerry) Pi as our Chief Technology Officer in September 2014. Mr. Pi is a pioneer in 5G technology, having led the group at Samsung that developed a working prototype for mobile transmission at 28 GHz. Mr. Pi is a thought leader in millimeter wave mobility. He has authored more than 30 technical journals and conference papers and is a co-inventor of more than 150 patents and applications.

(Emphasis added.)

85.    The 2015 10-K contained SOX certifications signed by Defendants D. Jonas and Rand stating that the financial information contained in the 2015 10-K was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

86.    On December 1, 2015, the Company filed a Form 8-K with the SEC disclosing the following:

There have been anonymous allegations regarding the circumstances under which certain of our spectrum licenses were renewed by the FCC in 2011 and 2012. Although we are conducting an investigation

of the matter, we believe that the requirements related to such renewals, including the required showings of substantial service, were met. We expect the investigation to take several months to complete. There are other requirements imposed by FCC rules and regulations on certain licensees, including restrictions on the discontinuation of operations. The preliminary results of our investigation into the renewal allegations indicate that a significant amount of the equipment that had been installed in connection with the substantial service showings is no longer present at the original locations. We have informed the FCC about the status of our investigation. We have arranged for replacement equipment to be procured and deployed, as we continue to prepare to deploy upgraded equipment later in fiscal 2016 for point-to-multipoint (PMP) applications at 39GHz, while pursuing our long-term plans for providing 5G mobility services using our licensed spectrum. The point-to-multipoint equipment is being produced by Cambridge Broadband Networks Ltd., a leader in development of PMP technology. To date, we have invested $1 million to expedite Cambridge's production of a PMP product for 39 GHz spectrum.

87.   The statements referenced in ¶¶ 68-86 above were false and/or misleading statements of material fact because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the value of Straight Path's key spectrum assets is overstated, and in fact, they may not be commercially viable; (2) Straight Path's spectrum licenses may have been fraudulently obtained by its predecessor company and may not be valid; and (3) as a result of the foregoing, the

Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Slowly Emerges

88.   On October 29, 2015, Kerrisdale Capital published a report titled "Straight Path Communications Inc. (STRP) The Next Generation of Overblown Spectrum Hype" (the "Kerrisdale Report"). The Kerrisdale Report questions the commercial viability of Straight Path's spectrum licenses, and provided the following summary:

5G ≠ mmWave. Straight Path enthusiasts tend to mix up distinct concepts, speaking as if every new announcement about "5G" – like Verizon's – necessarily involves mmWave. But many key aspects of the nascent 5G vision have nothing to do with high-frequency spectrum at all. New air interfaces and massive MIMO, for instance, are technologies that can greatly enhance throughput in the bands already used for 3G and 4G, as well as low-frequency bands to be rolled out in the future, like the 600MHz band, which FCC Chairman Tom Wheeler described in August as "a prime candidate for deployment of a wide-area 5G coverage layer." In early October, the Chinese equipment vendor Huawei and the Japanese carrier NTT DOCOMO "announced…the world's first successful large-scale field trial of 5G new radio access technologies," including Sparse Code Multiple Access and Filtered OFDM, achieving peak downlink throughput of 3.6 gigabits per second (Gbps). But this trial didn't use mmWave: the press release clearly states that it used "the sub-6GHz frequency band." Indeed, the first commercial deployments of 5G – whenever they occur – are widely expected to use conventional bands, not mmWave.

5G is also about far more than just higher throughput for smartphones. Key players see it primarily as a platform for communicating with

large numbers of distributed sensors (the "Internet of Things") and other machines, like driverless cars, that may require extremely low latencies and high reliability but not necessarily large quantities of data. (Driverless cars, for instance, are not going to be watching lots of ultra-high-resolution video.) For these crucial and novel use cases at the heart of 5G planning, mmWave is irrelevant. Indeed, Verizon's own promotional video about its 5G efforts emphasizes the Internet of Things and features the company's vice president of network planning stating (at 0:54) that "people have enough throughput for the kinds of services they're performing today on the mobile network" – hardly an indication that enormous amounts of mmWave bandwidth will come in handy any time soon.

Straight Path's spectrum is just one tiny drop in the mmWave bucket. Straight Path likes to point out (see slide 6) that it holds "96% of active 39GHz FCC licenses"; credulous listeners interpret this as a monopoly on "5G spectrum." Yet the company's 828 39GHz licenses comprise just 34% of the total 2,450 licenses that were up for bid at the FCC's 2000 auction. The explanation is that so many of the companies that attempted to use the 39GHz band gave up, went out of business entirely, or ran into trouble with the FCC that large numbers of licenses across the country were voluntarily canceled or forcibly terminated. (Indeed, Straight Path itself, in its previous identity as IDT Spectrum, canceled 298 of its 39GHz licenses in 2010 – almost a third of the portfolio it had acquired out of the Winstar bankruptcy.) Based on the FCC's recently released Notice of Proposed Rulemaking (NPRM), these unused licensed will ultimately be reauctioned to the public, thereby completely circumventing Straight Path.

But the future sale of a large amount of 39GHz spectrum not held by Straight Path is just a small part of a very large problem: the only reason to use mmWave bands at all is because there is so much spectrum available there. Without this vast supply, research into mmWave mobile broadband might be an interesting academic problem but would be an obvious commercial non-starter given all the immense and as yet unsolved technical difficulties. The only practical reason to bother is the prospect of accessing huge blocks of spectrum, which regulators around the world are beginning the process of freeing up.

From a technological perspective, there is nothing special about Straight Path's 39GHz band as opposed to the many other mmWave bands, including several that either are or are likely to become unlicensed and thus free to use.

The chart below illustrates the size (in gigahertz of bandwidth) of the mmWave bands most likely to be repurposed for mobile use in the medium term, putting Straight Path's holdings in perspective:



CITEL/CEPT/APT/RCC are regional regulatory bodies for the Americas/Europe/Asia/Eurasia, respectively.
Note: "FCC NPRM bands" includes the 60GHz band (57-64 GHz) already available for unlicensed use.
Source: DIGITALEUROPE summary of regional proposals, mmWave NPRM, Kerrisdale analysis

Above, on the left, we show the aggregate amount of high-frequency bandwidth proposed for consideration as future homes for mobile broadband by various regional regulatory bodies, including CITEL, the Inter-American Telecommunication Commission, of which the FCC is a member. These proposals will be further discussed at the upcoming World Radiocommunication Conference (WRC) in November and finalized in 2019. We also show the total size of the bands in the FCC's recent NPRM, including the existing 60GHz band, already available for unlicensed use, including mobile. But these bands are only the first step – FCC Chairman Tom Wheeler has already publicly pledged to consider others in the near future. With 20 to 30 GHz in

sight, Straight Path's nationwide average of 817 MHz, including 691 MHz in the 39GHz band and 126 MHz in the LMDS band, looks trivially small. (Even that total is overstated since much of the LMDS band is excluded from both the NPRM and the international proposals.) Far from a mmWave monopoly, Straight Path's holdings amount to a drop in the bucket. Anyone interested in using mmWave spectrum will have an embarrassment of riches.

Moreover, the supply is likely to grow further, from tens to hundreds of gigahertz, a point ably made in 2011 by two of the mmWave researchers then at Samsung, one of whom went on to become Straight Path's chief technology officer. They argued that there was 252 GHz of readily usable bandwidth between 3 and 300 GHz, and that even if only 40% could be unlocked for mobile networks, it would amount to "more than 200 times the spectrum currently allocated for this purpose below 3GHz."



Source: "Millimeter-wave Mobile Broadband: Unleashing 3-300GHz Spectrum"

Indeed, one of the benefits of mmWave technology that the Samsung mmWave group has often pointed out is that there's so much spectrum

- 51 -

for the taking that even exclusive access will be incredibly cheap – potentially good news for carriers and consumers but not spectrum owners like Straight Path.

In keeping with the absence of any compelling reason to prefer Straight Path's spectrum to other similar bands, recent 5G demos have focused elsewhere. For example, back in July 2014, Ericsson, in collaboration with NTT DOCOMO and SK Telecom, demonstrated 5Gbps speeds using the 15GHz band. In March, NTT DOCOMO and Nokia achieved a speed of 4.5 Gbps using the 70GHz band. In April, at the Brooklyn 5G Summit, Nokia demonstrated "a 10 Gbps peak rate system over the air at 73 GHz." Consumer products using the large, unlicensed 60GHz band via the WiGig protocol already exist. In short, mmWave spectrum will be a commodity in vast supply, and Straight Path has nothing special to offer. In fact, because Straight Path's 39GHz holdings consist of scattered 50MHz units, not the very wide contiguous channels sought after by industry participants, it's difficult to see how, without significant favors granted by the FCC, it will ever be practical to use its spectrum for 5G.

mmWave spectrum has fundamental limitations that, even if technology improves, will sharply restrict its usefulness. To be sure, major companies have developed prototypes and simulations showing that sophisticated antenna arrays using very wide bandwidths can overcome some of the propagation problems of the mmWave bands. But it's a long way from large, clunky prototypes to real-world networks and user devices. In particular, even if signals can reliably achieve targeted ranges on the order of hundreds of meters, they will still suffer from enormous losses when going from outside to indoors – orders of magnitude worse than conventional cellular frequencies, many of which already struggle with in-building penetration. Since approximately 80% of cellular usage is indoors (almost always using signals transmitted from outside), the practical applications of mmWave technology will be few and far between. mmWave handsets also face severe challenges since the user's head and fingers can easily block the narrow beams used by mmWave signals, potentially requiring multiple duplicate antenna arrays on different sides of the handset. High power consumption is also a problem. Perhaps most

dauntingly, mmWave networks will require extremely high basestation densities, thousands of times higher than existing networks, implying enormously costly and time consuming buildouts for no clear economic benefit. It's no wonder that the CEO of one Hong Kong-based carrier dismissed 5G as the creation of "equipment vendors…asking us to plow more money in there for a purpose that is not yet entirely clear….You don't need that much bandwidth."

Valuation precedents and benchmarks imply that Straight Path's spectrum is worth >90% less than its current market cap. Even if we ignore the shortcomings of Straight Path's spectrum, the likelihood that mmWave networks will simply never be deployed on a large scale, and the vast supply of highly similar competing spectrum, Straight Path is still worth very little. For example, based on the price at which Level 3, a large, savvy telecom firm, was willing to sell 39GHz and LMDS licenses in 2012 – just $203,000 for more than 46 billion MHz-pops – Straight Path's entire portfolio is worth just $1 million. Attempting to extrapolate from dollar-per-MHz-pop levels paid for conventional cellular spectrum but adjusting for the vastly higher cost of deploying the extremely dense network that mmWave would require generates an estimated value of approximately $40mm – more than 90% below the current market cap. Simply put, Straight Path is a bubble, driven by hype, misconceptions, and wishful thinking.

89.    On this news, the Company's shares fell $18.23 per share, or over 38%, from $47.58 at close on October 28, 2015, to $29.35 per share at close on October 29, 2015, damaging investors.

90.    On November 5, 2015, Sinclair Upton Research published a report titled "Straight Path Communications Inc. (STRP) How to commit fraud against the FCC and get away with it (until now)" (the "Sinclair Report"). The Sinclair Report asserts that the Company's licenses for the 39 GHz wireless sites were

renewed only after the Company made fraudulent representations to the FCC and

provided the following summary:

> There is overwhelming evidence that the vast majority of Straight Path Communications' ("Straight Path") 39 GHz spectrum licenses' Required Notification of Construction/Coverage Applications were obtained under fraudulent misrepresentation, because the systems were never built on the sites as specified in the filings.

> Michael Rapaport, as a representative of IDT Spectrum and Spectrum Holdings Technologies ("IDT"), the transferors of Straight Path's 39 GHz licenses, has likely committed over 150+ counts of fraud against the US government and made a mockery of the FCC's trust-based license renewal process. Instead of spending vast amounts of time, money, and resources to actually building up the required 39 GHz wireless sites in the 173 Basic Economic Areas (BEA) across the country, IDT/Rapaport gamed the system by filing construction/coverage substantial service Required Notifications that would pass FCC renewal process with nothing but a word processor.

> Almost all of the 39 GHz systems that are claimed to be "constructed" by IDT to provide Substantial Service as required for their 39 GHz license renewals in 2011-2012, cannot possibly been able to meet their performance specifications, as their purported systems defy the laws of physics, geometry, economics, and common sense. Readers, investors, and the FCC can easily verify for themselves that IDT's systems were never built or operating at the time of renewal.

> Even if Straight Path's licenses have any value at all (which they don't), because they were renewed under false statements of coverage/construction, the licenses are at high risk of being terminated and stripped from Straight Path's ownership. Thus, the fair value of Straight Path stock without ownership of the 39 GHz licenses and being banned from future FCC spectrum participation is $1.00-2.00 per share, or approximately liquidation value.

> We urge the Federal Communications Commission (FCC) and regulatory authorities to immediately open an investigation into the license renewal process of Straight Path's 39 GHz licenses and ask Straight Path for proof that the Required Constructions were met for all of the systems claimed to be built in the 173 Basic Economic Areas. Companies should not be allowed to lie to the US Government and get away with it.

91.     On this news, the Company's shares fell $13.70 per share or almost 52%, from $26.51 per share at close on November 4, 2015, to $12.81 per share at close on November 5, 2015, damaging investors.

92.     On December 3, 2015, Sinclair Upton Research published an updated report titled "Sinclair Upton Update On Straight Path Communications Inc. (STRP) via Activist Shorts Research," which stated in relevant part:

> The house of lies is crumbling, yet management still covers up the truth
>
> Questions for management from the 8-K
>
> Straight Path's 8-K released on 12/1/15 contained some interesting disclosures related to the substantial service filings for their 39 GHz license renewals. The most telling is that after self-investigation, the company has discovered "that a significant amount of the equipment that had been installed in connection with the substantial service showings is no longer present at the original locations". In response, we ask management the following questions:
>
> What happened to the equipment that you originally "installed"? Did Straight Path itself remove the equipment after getting the renewals? Did weather, wildlife, or thieves remove the antennas and radios across all 175 BEAs? Why does the company have no knowledge or control over its own equipment?

- 55 -

Why does it take months to investigate whether your company actually installed equipment at the sites claimed in 2011-2012? How do you not know this simple fact about your most touted asset, the 39 GHz licenses? If you had paid for the equipment, installation, and space arrangements at the buildings and towers at the purported sites, why don't you have the invoices or financial records showing this?

Do you really plan to install replacement equipment at all of the 175 sites as originally specified on the substantial service filings, including American Samoa and Puerto Rico? How much will this cost? How will the replacement equipment broadcast a signal over a 30+ mile radius without constructing an antenna at least 600 feet above ground?

1.    Was the equipment that was "removed" been out of operation for more than 30 days or more than 1 year since 2011-2012? If so, will you deny that the ceasing of service was a permanent discontinuation and therefore subject to automatic termination of the licenses by the FCC?

2.    Now that management has changed its story to "the equipment was there in 2011-2012 at the time of the filings, but the equipment is not there today", will the story change again after the FCC, media, and public finds out that the equipment was never there in the first place?

**More evidence that IDT equipment was never at the locations as claimed in 2011-2012 filings**

Straight Path now says that even though the equipment is not there today, the equipment was there at all locations as originally filed in 2011-2012, thus satisfying the substantial service requirements for renewal. However, this is easily disproven, simply by contacting the property/landowner at the sites and asking if there was any wireless equipment installed by IDT at that time.

For example, we have confirmed that the 3 sites below NEVER had any wireless equipment belonging to IDT on their property in 2011-2012.

Filing #0004810095, Deluxe Inn, 1135 Market Street, Redding, CA
(40.588213, -122.391921)

http://www.hotels.com/ho347077/deluxe-inn-redding-united-states-of-america/
Filing #0005323915, Quality Inn, 511 West Central Avenue,
Titusville, PA (41.626773, -79.681792)

https://www.choicehotels.com/pennsylvania/titusville/quality-inn-hotels/pa357
Filing #0004838998, White House Inn, 500 6th Avenue SW,
Aberdeen, SD (45.459831, -98.495543)

http://www.aberdeenwhitehouseinn.com/

These are fine hotels with excellent hospitality. We encourage everyone interested to book a room, take a short vacation, and see for themselves whether Straight Path's equipment was actually installed on the sites in 2011-2012.

These 3 sites are not isolated instances where Straight Path "forgot" to install equipment. They are evidence of a repeated pattern of intentionally falsified substantial service filings (if needed, we have more evidence). Will Straight Path continue to claim that all equipment was installed originally, even though that is verifiably false?

**Conclusions**
1. We stand by our original report's assertion that almost all of Straight Path's substantial service sites were never actually built. The latest 8-K is further evidence, coming from the company itself, that supports our assertion that no sites were ever built.

2. Because Straight Path has now made material misrepresentations to investors in its effort to cover up the truth in the most recent 8-K filing, namely "equipment that had been

installed", the SEC has cause to investigate the company, in addition to the Department of Justice and the FCC. It is never a good idea to lie on public filings, whether they are for the FCC or the SEC. Why add to the fraud and increase the risk of more serious consequences?

3.   Even if hypothetically the purported equipment was installed and operating at the time of the substantial service filings (which it was not), by management's own admission the equipment was removed at some point after 2011-2012. If the equipment was removed and not operating for 30 days or more, then the license will be automatically forfeited. If the station was not operating for more than 1 year, that constitutes a permanent discontinuation of service, and the licensee must cancel the license. Therefore, the FCC is likely to terminate Straight Path's 39 GHz and LMDS licenses. The value of STRP's remaining assets, not counting the negative impact of future fines and lawsuits, is approximately $1.00-$2.00 per share. See links below:

https://www.law.cornell.edu/cfr/text/47/1.955

https://www.law.cornell.edu/cfr/text/47/101.65

4.   We end with a question for the FCC – If Straight Path is allowed to keep their licenses and goes unpunished, do you really want to set a precedent of rewarding egregious fraudulent behavior (and continued willing and repeated dishonesty) with a giveaway of wireless spectrum licenses?

93.   As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company has suffered significant losses and damages.

## DAMAGES TO STRAIGHT PATH

94.    As a direct and proximate result of the Individual Defendants' conduct, Straight Path has lost and has expended and will continue to expend many millions of dollars.

95.    Such expenditures include, but are not limited to, legal fees associated with the federal securities fraud class action lawsuit filed against the Company and certain of its management, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

96.    Such losses include those due to the unjust enrichment of the Individual Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses and other compensation connected to the Individual Defendants' intentional false and misleading statements, and through lucrative sales of Company stock on material non-public information.

97.    As a direct and proximate result of the Individual Defendants' conduct, Straight Path has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

98.    Plaintiff brings this action derivatively and for the benefit of Straight Path to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Straight Path and unjust enrichment, as well as the aiding and abetting thereof.

99.    Straight Path is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.   Plaintiff is, and at all relevant times has been, a Straight Path shareholder.  Plaintiff will adequately and fairly represent the interests of Straight Path in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

101.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

102.   A pre-suit demand on the Board of Straight Path is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the

following four Individual Defendants: D. Jonas, Todd, Weld, and Zeidman (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to two of the four Directors that are on the Board at the time this action is commenced.

103.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

104.   In complete abdication of their fiduciary duties, the Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by making and/or causing the Company to make false and misleading statements by failing to disclose to the investing public that: (1) the value of Straight Path's key spectrum assets is overstated, and in fact, they may not be commercially viable; and  (2) Straight Path's spectrum licenses may have been fraudulently obtained by its predecessor company and may not be valid.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Directors breached their

fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

105.   Additional reasons that demand on Defendant D. Jonas is futile follow.   Defendant D. Jonas, as the Company's Chairman and Chief Executive Officer is thus a non-independent director.   He was ultimately responsible for the Company's operations and a number of the false and misleading statements and omissions that were made, including those contained in the conference calls, and the SEC filings, all of which he signed.

106.   Moreover, Defendant D. Jonas is beholden to, and controlled by, his father, Defendant H. Jonas.   Lacking any prior experience, Defendant D. Jonas has been placed by his father as head of the Company, earning income of approximately $2 million per year, a far cry from his former position as Rabbi in a local synagogue.   His stock holdings, worth at least $4 million, also reveals his interest in keeping the Company's stock price as high as possible. The insider sales made by Defendant D. Jonas, which yielded $539,970 in net proceeds, demonstrates his motive in facilitating and participating in the fraud.

107.   Defendant D. Jonas is also a defendant in the securities fraud class action lawsuit.   Thus, for these reasons, too, Defendant D. Jonas breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.   Finally, Defendant D. Jonas conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over the Company's statements and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Thus, for these reasons, too, Defendant D. Jonas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.   Additional reasons that demand on Defendant Weld is futile follow. Defendant Weld has served as a compensated Company Director throughout the Relevant Period.   Defendant Weld is beholden to Defendant H. Jonas and Defendant D. Jonas.  Defendant Weld is a partner at the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz, Levin").  Mintz Levin represents Straight Path in "in legal proceedings related to the Company's enforcement of its intellectual property rights," and thus, Defendant Weld's income is directly affected by the actions of Defendant H. Jonas and the Directors.

110.   Further, the insider sales made by Defendant Weld which yielded $251,754 in net proceeds, demonstrates his motive in facilitating and participating in the fraud.

111.   As a member of the Audit and Compensation Committees and Chairperson of the Corporate Governance and Nominating Committee, Defendant Weld conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over the Company's statements and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Todd breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.   Additional reasons that demand on Defendant Todd is futile follow. Defendant Todd has served as a compensated Company Director throughout the Relevant Period.  His stock holdings, worth at least $245,000, also reveals his interest in keeping the Company's stock price as high as possible.  As the Chairperson of the Compensation Committee, Defendant Todd conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls

over the Company's statements and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Todd breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113. Additional reasons that demand on Defendant Zeidman is futile follow. Defendant Zeidman has served as a compensated Company Director throughout the Relevant Period. His stock holdings, worth at least $245,000, also reveals his interest in keeping the Company's stock price as high as possible. As the Chairman of the Audit Committee, and member of the Corporate Governance Committee, Nominating Committee and Compensation Committee, Defendant Zeidman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over the Company's statements and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Zeidman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.   Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other and especially to Defendant H. Jonas and Defendant D. Jonas. Evidence is a dividend that the Board authorized in favor of minority shareholders of Straight Path IP, including Defendant H. Jonas.  As holder of 100 shares of Straight Path IP common stock, Defendant H. Jonas received a pro rata share of the distribution in the amount of $564,734.00.

115.   The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to Straight Path's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with our interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

116. The Current and Former Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's public statements and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

117. Straight Path has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Straight Path any part of the damages Straight Path suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

118. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the

transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

119.   The acts complained of herein constitute violations of fiduciary duties owed by Straight Path's officers, directors and/or controlling shareholders, and these acts are incapable of ratification.

120.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Straight Path.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Straight Path, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will

provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

121.  If there is no directors' and officers' liability insurance, then the Directors will not cause Straight Path to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

122.  Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least two of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

123.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Straight Path's business and affairs.

125.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Straight Path.

127.   In breach of their fiduciary duties owed to Straight Path, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements about the Company, and failed to properly oversee Straight Path's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

128.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations, value and prospects and they failed to correct the Company's public statements about the Company.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted

with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Straight Path's securities and disguising self-dealing transactions.

129.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Straight Path's securities and engaging in self-dealing transactions.

130.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Straight Path has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

132.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.   By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Straight Path.

134.   The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Straight Path that was tied to the performance or artificially inflated valuation of Straight Path, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, benefited from lucrative sales made on material non-public information, and/or benefited due to unfair related-party transactions.

135.   Plaintiff, as a shareholder and a representative of Straight Path, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, proceeds from insider sales, and benefits from unfair related party transactions, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

136.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Straight Path, for which they are legally responsible.

138.  As a direct and proximate result of the Individual Defendants' abuse of control, Straight Path has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Straight Path has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

139.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their

responsibilities and fiduciary duties with regard to prudently managing the assets and business of Straight Path in a manner consistent with the operations of a publicly-held corporation.

141.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Straight Path has sustained and will continue to sustain significant damages.

142.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

143.   Plaintiff, on behalf of Straight Path, has no adequate remedy at law.

## **<u>PRAYER FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Straight Path, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Straight Path;

(c)   Determining and awarding to Straight Path the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-

judgment interest thereon;

(d)   Directing Straight Path and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Straight Path and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.   a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.   a provision to permit the shareholders of Straight Path to nominate at least two candidates for election to the board; and

3.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Straight Path restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action,

including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 29, 2016            Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ  07079
Telephone: (973)  313-1887
Facsimile: (973) 833-0399

**BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Mike Hofer, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this **29** day of January, 2016.

_____  Mike Hofer